ams

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 06-40160-05-JAR |
| | ) | |
| BERNICE STEWART, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

This matter comes before the Court on defendant Bernice Stewart's Motion to Suppress Evidence (Doc. 80).  The Court held an evidentiary hearing on April 8, 2008.  Having reviewed the briefs and the evidence presented to this Court at the hearing, the Court is now prepared to rule.  For the reasons stated below, defendant's motion to suppress is denied.

### *Background*

On October 11, 2006, Judge Rogers signed an order pursuant to 18 U.S.C. § 2518 authorizing a wiretap to and from Target Telephone 1, the primary user of which was defendant Michael Jordan.  The affidavit in support of the wiretap was executed by Officer Douglas Garman, Task Force Officer with the Drug Enforcement Administration ("DEA") and Narcotics Investigator for the Topeka Police Department.  Officer Garman has worked in law enforcement since 1995 and has been with the Topeka Police Department for much of that time.  He has worked with the DEA task force for approximately one year.  Officer Garman attends several hundred hours worth of continuing education each year.  He is the case agent for this case and was responsible for drafting the search warrant affidavit, pen register application, and wiretap

affidavits.

Garman set forth in the wiretap affidavit that there was probable cause to believe that Jordan and others, including Stewart, had committed, were committing and would continue to commit various drug offenses. Defendant Stewart is listed in the affidavit as a "person to be intercepted," and the affidavit identifies Stewart as Jordan's sister. Officer Garman explained in the affidavit that "[n]umerous investigative techniques that are usually employed in the investigation of this type of criminal case have been tried and failed, reasonably appear to be unlikely to succeed if they are tried, or are too dangerous to employ." He then spent approximately sixteen pages outlining the various techniques and their shortcomings, including physical surveillance, trash searches, the use of undercover police officers or agents, GPS tracking surveillance, the use of cooperating individuals, use of grand jury subpoenas, interviews of subjects or associates, pen registers, toll analysis, subscriber information, and search warrants.

The affidavit provides Stewart's criminal history. The affidavit states that the criminal history was based on computer inquiries through the National Crime Information Center ("NCIC") and lists a number of arrests and one conviction. Shortly before the evidentiary hearing in this matter, Officer Garman ordered another NCIC report and a KBI search for Stewart's criminal history. The criminal history set forth in these updated reports is consistent with the affidavit but has been updated with the information about the underlying case.

The affidavit further contains a number of accounts of controlled purchases of cocaine from Jordan that involve the residence of defendant Stewart on S.E. Swygart in Topeka, Kansas. These all involve purchases by a confidential informant in conjunction with police surveillance of Stewart's residence. Additionally, the affidavit refers to surveillance of a suspected drug

transaction between Kristen Miller and Jordan that occurred at the S.E. Swygart address.

On November 9, 2006, Judge Rogers authorized another wiretap on Target Telephone 2, after pen register information made it apparent that Jordan had switched to this phone for active drug trafficking. The affidavit in support of that wiretap again listed Stewart's criminal history and stated that she was a potential interceptee. The affidavit stated that there were over 200 phone calls between Target Phone 1 and Stewart's phones from April 16 to September 19, 2006. This affidavit also recounts an incriminating call between Stewart and Jordan that was intercepted during the first wiretap.

A pen register and trap and trace device was utilized prior to these wiretaps in the spring of 2006 and information derived from these methods is set forth in both wiretap affidavits. Officer Garman testified that a filter was mistakenly not utilized with the technology that records the pen register and trap and trace data. As a result, text messages were inadvertently recorded. On May 2, 2006, the government filed a notice of overcollection, accompanied by the affidavits of three agents. After considering this notice, Magistrate Judge Sebelius entered an order to seal, finding that the government's notice was filed in good faith, as the government inadvertently intercepted certain text messages between April 12, 2006 and April 26, 2006 pursuant to a pen register and trap and trace order. Judge Sebelius ordered that the floppy disk containing the text messages be held in DEA custody for a period of ten years and only disclosed upon order of the Court and that it should not be used in any investigation or prosecution. Officer Garman testified that the information does not appear in either wiretap affidavit and that he does not recall the substance of the text messages.

*Discussion*

**1.      Alleged Misrepresentations in Wiretap Affidavit**

First, defendant Stewart alleges that Officer Garman misrepresented Stewart's criminal

history in the affidavit.  She asserts that her identity had been stolen and used by another woman

and that she had reported this fact to law enforcement.  Stewart also asserts that none of the drug

transactions described in the affidavit took place in Stewart's residence or in her presence, but

that "[t]he affidavit was written in such a way to make it appear that at least some of these

transactions took place in the residence located at [] SE Swygart, when in fact, none of the

transactions described took place in the residence or in the presence of the defendant Stewart."

While defendant's motion is not labeled as such, an application and affidavit for wiretap

authorization are subject to the requirements set forth in *Franks v. Delaware*.[1]  *Franks* allows a

defendant to request an evidentiary hearing regarding the veracity of the affidavit.[2]

> Before being entitled to such a hearing, the defendant must allege
> deliberate falsehood or reckless disregard for the truth, and those
> allegations must be accompanied by an offer of proof. . . .  If these
> requirements are met, then the defendant must show that the
> remaining content of the warrant affidavit is insufficient to support
> a finding of probable cause.  "The standards of deliberate
> falsehood and reckless disregard set forth in *Franks* apply to
> material omissions, as well as affirmative falsehoods."[3]

After considering the evidence presented at the *Franks* hearing, if the district court concludes by

a preponderance of the evidence that the affidavit contains "intentional or reckless false

statements," or "material omissions," "'then the district court must suppress the evidence

---

[1]438 U.S. 154 (1978); *see United States v. Green*, 175 F.3d 822, 828 (10th Cir. 1999).

[2]*See, e.g.*, *United States v. Artez*, 389 F.3d 1106, 1116 (10th Cir. 2004) (citing *Franks*, 438 U.S. at 171).

[3]*Id.* (quoting *United States v. Avery*, 295 F.3d 1158, 1166 (10th Cir. 2002)).

4

obtained pursuant to the warrant.'  If, however, the district court concludes that the omitted information would not have altered the magistrate judge's decision to authorize the search, the fruits of the challenged search need not be suppressed."[4]  A wiretap affidavit, though, "is presumed proper, and the defendant bears the burden of overcoming this presumption."[5]

The Court finds that Stewart has made no offer of proof that Officer Garman misrepresented her criminal history in the affidavit.  Stewart maintains in her motion that her identity had been stolen and used by someone else and that she had reported this to law enforcement.  But Officer Garman testified that after being made aware of this allegation by the government, he checked records from the Topeka Police Department, Shawnee County Sheriff's Officer, and the Shawnee County courts and was unable to find any victim report by Stewart of identity theft; only a report of auto theft.  He testified that it was routine for him to rely upon NCIC reports, derived from a person's date of birth, social security number, and FBI number(s) in order to discover criminal history.  Officer Garman also testified about the difficulty of finding victim information, as there is no national database for such information.  He also testified that, based on the most recent NCIC report, he would have prepared the criminal history exactly the same today as he did when he prepared the affidavit.  The Court finds Officer Garman to be credible and trustworthy and accepts his testimony as true.  Conversely, defendant offers no proof that (1) the criminal history is incorrect, or (2) Officer Garman deliberately misrepresented Stewart's criminal history in the affidavit.  Accordingly, she is not entitled to a

---

[4]*Avery*, 295 F.3d at 1166–67 (quoting *United States v. McKissick*, 204 F.3d 1282, 1297 (10th Cir. 2000)).

[5]*Green*, 175 F.3d at 828.

5

*Franks* hearing based on the statement of her criminal history in the affidavit.[6]

Next, Stewart alleges that Officer Garman misrepresented in the first affidavit that certain drug transactions took place either inside her home or in her presence, when in fact they did not. A number of controlled purchases of cocaine are described in the affidavit, all of which involved a certain confidential informant who allowed police to record phone conversations between himself and Jordan during the course of the controlled purchases. According to the affidavit, many of the transactions occurred at Stewart's address, although none explicitly state that they occurred inside the home, or in Stewart's presence. In fact, many specify that the transaction occurred in front of the home, not inside.[7] Officer Garman testified that none of these transactions occurred inside the home between December 2005 and December 2006 and unequivocally testified that all of the controlled purchases at issue occurred *at* the home, but that none occurred *inside* the home. Accordingly, the Court is unable to find any material omission present that would justify a *Franks* hearing with regard to the controlled purchases involving the confidential informant.

The only paragraph that appears to be at issue, therefore, is paragraph 22, which recalls information received by the DEA from Detective Ron Hall with the Columbia, Missouri Police Department on October 29, 2004. According to the affidavit, Detective Hall relayed that Kristen Miller was traveling to Topeka to obtain a kilogram of cocaine and asked for assistance to conduct surveillance of Miller when she arrived in Topeka. Investigators in Topeka followed

---

[6]Even if there was proof of such a misrepresentation, the statement of Stewart's criminal history would have no impact on the probable cause or necessity requirements of the wiretap affidavit. *See Green*, 175 F.3d at 828.

[7]Doc. 142, Ex. 1 ¶ 34 ("CS-1 met with Jordan in front of Stewart's residence); ¶ 35 (same); ¶ 36 ("Jordan got into CS-1's vehicle and CS-1 and Jordan drove around the block").

Miller to defendant Jordan's residence and after she stayed there for a short period of time, investigators followed her to Stewart's residence on S.E. Swygart. "Miller left the residence at [] S.E. Swygart and drove towards Columbia, Missouri." Missouri Highway Patrol conducted a traffic stop but no cocaine was discovered. However, Detective Hall relayed that a confidential informant told police that Miller had obtained the cocaine but had strapped it to her body, which was not discovered during the traffic stop. Defendant offers no proof that this paragraph involves either a material omission or a misrepresentation by Officer Garman. There is no implication in the paragraph that defendant Stewart was present during this transaction. Moreover, even if defendant is correct and the paragraph should have included an indication that Miller did not enter the residence and that Stewart was not present, it would not suffice to negate the probable cause established by the remainder of the affidavit in support of the wiretap. Stewart's request for a *Franks* hearing on this issue is denied.

## 2.    Necessity Requirement

Defendant Stewart alleges that the affidavit did not make an adequate showing of necessity. She argues that physical surveillance, confidential informants, trash searches, tracking devices, grand jury subpoenas, interviews, and further use of pen registers could have provided officers with more information. Under Section 2518, the government must submit to the issuing magistrate judge "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried."[8] This is called the "necessity requirement."[9] The Tenth Circuit has recently summarized

---

[8] 18 U.S.C. § 2518(c)(1).

[9] *See, e.g.*, *United States v. Verdin-Garcia*, 516 F.3d 884, 889 (10th Cir. 2008).

the necessity requirement at length:

> "The purpose of this requirement is to ensure that the relatively intrusive device of wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *Id.* (quoting *United States v. Edwards*, 69 F.3d 419, 429 (10th Cir.1995)) (internal quotation marks and further citation omitted). "Traditional investigative techniques" include surveillance, infiltration or undercover work, questioning of participants, execution of search warrants, and the use of pen registers and trap-and-trace devices. *See, e.g.*, *United States v. Ramirez*, 479 F.3d 1229, 1240 (10th Cir.2007); *United States v. Ramirez-Encarnacion*, 291 F.3d 1219, 1222 n. 2 (10th Cir.2002). Section 2518 does not, however, mandate exhaustion of all possibilities; the requirement is "met if the government demonstrates either [that] normal investigatory techniques have been tried and failed or that they 'reasonably appear to be unlikely to succeed if tried, or to be too dangerous to try.' " *Ramirez*, 479 F.3d at 1240 (quoting *United States v. Castillo-Garcia*, 117 F.3d 1179, 1187 (10th Cir.1997)). The necessity requirement is not to be treated hypertechnically. We expect the government to act "in a common sense fashion," and on review we will take in "all the facts and circumstances in order to determine whether the government's showing of necessity is sufficient to justify a wiretap." *Ramirez-Encarnacion*, 291 F.3d at 1222 (internal quotation marks omitted). The overall burden on the government "is not great." *United States v. Wilson*, 484 F.3d 267, 281 (4th Cir.2007) (internal quotation marks omitted); *United States v. McLee*, 436 F.3d 751, 763 (7th Cir.2006) (internal quotation marks omitted); *United States v. Armocida*, 515 F.2d 29, 38 (3d Cir.1975).[10]

In each of the wiretap affidavits, Officer Garman included a statement that numerous traditional investigative techniques had been tried and failed, reasonably appeared to be unlikely to succeed if tried, or are too dangerous to employ.  According to Officer Garman, the wiretaps were sought because agents had been unable to identify all of the sources of supply for the drug organization; it had also been unable to identify all of the locations used for storage of drugs and

---

[10]*Id.* at 889–90.

money.  Paragraphs 55-68 of the first affidavit explains in detail the efforts made by
investigators using traditional means and explains how investigators have fully exhausted those
means.  The second affidavit includes similar attestations in paragraphs 82-96.

Officer Garman also testified at the hearing about a number of investigatory techniques
that were either exhausted, or did not reasonably appear likely to succeed if tried.  Officer
Garman recounted the surveillance efforts targeted at Michael Jordan during the course of the
investigation and explained how Jordan had become acutely aware of his surroundings.  Garman
explained that Jordan had become adept at losing surveillance vehicles by driving into areas
where it would have become apparent that he was being followed if investigators had continued
to track him.  Officer Garman also recounted an incident that occurred within minutes after they
broke off surveillance of Jordan, where two men approached the unmarked surveillance vehicle
parked near Jordan's residence and told the investigators who were inside that they knew that
they were police officers.  While the men were unknown to investigators, it added to their belief
that Jordan was aware of the surveillance.  Officer Garman also testified that while officers could
park at various areas near Jordan's residence, Jordan would often identify them, which was later
confirmed on the wiretap.

During the course of the investigation, surveillance teams noticed a pattern of travel by
Jordan between Jordan's and Stewart's residences.  Defendant suggests that timing these trips
could have aided investigators attempts to locate Jordan's drug supply.  But Officer Garman
explained that this would not have been helpful because the length of time it took to get between
these locations often varied and depended on the route, speed, and frequency of stop signs or
traffic signals.

9

Stewart suggests that investigators could have tracked Jordan by using a helicopter. Officer Garman explained that while in some cases this might be a helpful investigatory technique, at the time of this investigation secure communication between ground surveillance and the helicopter was not possible.  As a result, their communications would have been broadcast over "clear air frequency," which can be picked up by anyone with a scanner.  Because in Officer Garman's experience he has learned that it is not uncommon for drug traffickers to own a scanner, this method risked tipping the subject of the investigation off about the fact that he was being followed.

Stewart urges that a GPS device could have been installed on Jordan's and defendant Angela Purfield's vehicles to monitor by computer or cellular phone.  Officer Garman explained that this technique is severely limited by the short battery life of the devices and by the fact that there was no foreseeable way for the confidential informant to install the device in Jordan's car—a warrant would have been required and only people familiar with the technology would have been equipped to install the device, which was not an option without Jordan learning of the installation.

Stewart appears to argue that the government must exhaust every possible investigative technique before it may obtain a wiretap, but as stated above, this is not the standard.  The Court has reviewed the wiretap affidavits and finds Officer Garman's testimony at the evidentiary hearing to be credible and trustworthy.  Taking into account all of the facts and circumstances surrounding the case, the Court finds that the government has met its burden of showing that the government's showing of necessity was sufficient to obtain the wiretaps in this case.

**3.      Overcollection Issue**

10

Stewart suggests that the overcollection of information from the pen register and trap and trace device should have resulted in denial of the government's wiretap applications.  But Stewart cites no authority for this assertion.  The Court has reviewed the overcollection notice, attached affidavits from the officers involved, and Judge Sebelius's order sealing the inadvertently obtained text messages, as well as Officer Garman's testimony that these text messages were not relied upon in any fashion to establish the probable cause needed for the wiretap affidavit.  It is undisputed that the text messages do not appear in the wiretap affidavits.  There is no evidence that these text messages were relied upon in the wiretap affidavit, nor is there any evidence that the investigators who were made aware of these text messages used the information in any manner other than to ensure that they were sealed in accordance with Judge Sebelius's order.  Officer Garman testified that he does not recall the substance of the text messages.  The Court declines to grant the motion to suppress on this basis.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Stewart's Motion to Suppress Evidence (Doc. 80) is **denied**.

**IT IS SO ORDERED**.

Dated this __28th__ day of April, 2008.

__ S/ Julie A. Robinson____
Julie A. Robinson
United States District Judge

11